

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 1, 2022**

United States Bankruptcy Judge

---

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Daniel Wilfred Mijares,** | § | **Case No. 19-33121-hdh7** |
| | § | |
| Debtor. | § | |
| | § | |
| **Jordan Pastorek, M.D.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **Adv. Proc. No. 19-03243** |
| | § | |
| **Daniel Wilfred Mijares,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Jordan Pastorek, M.D. (the "Plaintiff") claims that Daniel Wilfred Mijares, M.D. (the "Defendant") defrauded him and breached fiduciary duties owed to him by charging improper, excessive, and unauthorized expenses to their medical practice, causing the Plaintiff's distributions from the practice to be reduced during the roughly six years that they practiced medicine together.

1

The Plaintiff seeks a declaration from this Court that his claims for fraud and breach of fiduciary duty are nondischargeable pursuant to sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.

Ultimately, this is a dispute between two doctors who were the only members of a professional limited liability company. The Plaintiff allowed the Defendant much leeway in the operations of the practice, and the Defendant took advantage of that situation, charging the practice for improper expenses such as personal loans, health insurance for a relative who was not employed by the practice, and child support. The Plaintiff has sought claims for a much broader range of expenses though, including payments made by the practice on account of receivables sales agreements and an equipment lease.

For the reasons set forth in greater detail below, the Court finds that the Plaintiff holds a valid claim against the Defendant for fraud and that such claim is nondischargeable, but for many of the expenses that the Plaintiff identified as the source of damages, the Court was not presented with sufficient evidence to find that they were improper and harmed the Plaintiff. Because the Court has found the Plaintiff holds a nondischargeable claim for fraud against the Defendant, the Court does not reach the issue of whether the Plaintiff also holds a claim for breach of fiduciary duty against the Defendant.

## I.     **JURISDICTION AND VENUE**

This Court has jurisdiction over the parties and claims asserted in this proceeding under 28 U.S.C. § 1334. The claims in this adversary proceeding are core matters under 28 U.S.C. § 157(b)(2)(B) and (I), as they involve allowance or disallowance of claims against the estate and determinations as to the dischargeability of particular debts. Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II.    <u>PROCEDURAL HISTORY</u>

On December 23, 2019, the Plaintiff filed a complaint[1] initiating the above-captioned adversary proceeding against the Defendant.  The complaint was later amended.[2]  On June 15, 2020, the Defendant filed a motion seeking to dismiss the amended complaint.[3]  Following a hearing on August 18, 2020, the Court issued an order granting the dismissal in part but permitting the Plaintiff to replead.[4]  On September 8, 2020, the Plaintiff filed his second amended complaint (the "<u>Complaint</u>"),[5] which was followed quickly by a second motion to dismiss.[6]  The Court held a hearing on the second motion to dismiss on October 20, 2020, and subsequently issued an order dismissing the Complaint as to the relief sought under sections 523(a)(2)(B) and (a)(6) of the Bankruptcy Code[7] but allowing the Plaintiff to proceed on the counts for relief under sections 523(a)(2)(A) and (a)(4).  On November 20, 2020, the Defendant filed his Answer.[8]

---

[1] *Original Complaint to Determine Dischargeability of Debt Under 11 U.S.C. Sections 523(a)(2)(A) and (B), and (a)(4) and (a)(6) [Docket No. 1].*

[2] *First Amended Complaint to Determine Dischargeability of Debt Under 11 U.S.C. Sections 523(a)(2)(A) and (B), and (a)(4) and (a)(6) [Docket No. 11].*

[3] *Defendant's Motion Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and Rule 7012 of the Federal Rules of Bankruptcy Procedure to Dismiss Plaintiff's Claims and Objections to Discharge for Lack of Jurisdiction and Standing and Supporting Memorandum of Law [Relating to Adversary ECF Docket No. 11] [Docket No. 13].*

[4] *Order Regarding Defendant's Motion to Dismiss Plaintiff's Claims and Objections to Discharge [Relating to Adversary ECF Docket No. 13] [Docket No. 22].*

[5] *Second Amended Complaint to Determine Dischargeability of Debt Under 11 U.S.C. Sections 523(a)(2)(A) and (B), and (a)(4) and (a)(6) [Docket No. 18].*

[6] *Defendant's Second Motion Pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure and Rule 7012 of the Federal Rules of Bankruptcy Procedure to Dismiss Plaintiff's Claims and Objections to Discharge and Supporting Memorandum of Law [Relating to Adversary ECF Docket No. 18] [Docket No. 24].*

[7] *Order Regarding Defendant's Second Motion to Dismiss Plaintiff's Claims and Objections to Discharge (Relating to Adversary ECF Docket No. 24) [Docket No. 27].*

[8] *Defendant's Answer to Second Amended Complaint to Determine Dischargeability of Debt Under 11 U.S.C §§ 523(a)(2)(A) and (B), and (a)(4) and (a)(6) [Relating to Adversary ECF Docket No. 18] [Docket No. 31] (the* "<u>Answer</u>").

The parties submitted a *Joint Pretrial Order* that was signed and entered by the Court,[9] and trial was held on March 7, 8, 9, 10, and 14, 2022. After trial, the Court took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[10]

### III.   FINDINGS OF FACT

#### A.  The Parties

The Plaintiff and the Defendant are licensed Texas physicians who practiced internal medicine together as equal members of MD Request, PLLC ("MD Request"). The Plaintiff and the Defendant practiced together at MD Request from January 1, 2013, through April 2019. The Plaintiff and the Defendant each own 50% of the membership interests of MD Request, and each was appointed as a "Manager" of MD Request in the *Company Agreement of MD Request, PLLC* (the "Company Agreement").[11]

The Defendant was the member primarily involved with and responsible for the financial and accounting matters of MD Request. In this capacity, the Defendant frequently dealt with accounting professionals on behalf of MD Request. There is no written agreement governing or prescribing the compensation MD Request would pay to either the Plaintiff or the Defendant on account of their physician services. Instead, both parties testified that there was an oral understanding, confirmed by the parties' course of dealing and practice, that MD Request would compensate each physician using a formula whereby each physician would be paid the amount

---

[9] Docket No. 55.

[10] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

[11] Ex. 1.

4

that MD Request collected and received on account of such physician's patients reduced by 50% of MD Request's expenses for the applicable period.

## B. Dispute Regarding the Plaintiff's Compensation

Collections from MD Request patients were recorded by an independent third-party medical billing service and then deposited in the MD Request bank account. From 2013 until April 2019, the Defendant maintained primary control over MD Request's bank account. The Defendant relied on the billing firm to notify the Plaintiff and the Defendant of their total monthly collections. Per the arrangement described above, the Defendant then aggregated the monthly expenses of MD Request and paid the Plaintiff his monthly collections due, less his half of the business expenses, as calculated by the Defendant. The evidence showed that very few disagreements arose between the Plaintiff and the Defendant as to the amounts collected by MD Request from their respective patients. Instead, the present issues lie with the Defendant's allocation of expenses and his charging of certain expenses against the Plaintiff's share.

The Plaintiff testified that he asked the Defendant for itemized expense reports throughout the years, as he noticed what he considered to be a significant disparity between the amount collected on account of his patients and how much he was actually being paid. The evidence also showed that while the Defendant often failed to timely produce expense reports to the Plaintiff, he frequently provided the information to MD Request's independent, outside accountants for their use in preparing MD Request's financial books, records, and tax returns.

## C. Allegations of Improper Expense Deductions

The Plaintiff alleges that certain expenses charged to MD Request were improper expenses incurred by the Defendant. The calculation of alleged improper charges against the Plaintiff's share was not altogether clear. In his damage model, the Plaintiff alleges that expenses arising

5

from 16 different sources create liability in the amount of $234,128.05.  The alleged improper expenses can be grouped into five categories: (1) receivables purchases; (2) MedSpa-related expenses; (3) insurance payments; (4) rent payments; and (5) other expenses.

### 1.  Receivables Purchases

In 2017, the Defendant caused MD Request to enter into several receivables purchase and sale agreements.  The Plaintiff took issue with these agreements because (1) he was unaware of them, (2) the proceeds of some of those agreements were quickly transferred to the Defendant, and (3) he alleged some of the agreements were entered into for the Defendant's personal benefit.

On January 27, 2017, the Defendant, on behalf of MD Request, signed an *Agreement for the Purchase and Sale of Future Receipts* (the "First Receivables Agreement")[12] under which MD Request sold $58,492.28 worth of future receipts to Jet Business Loans, LLC ("Jet Capital") for $40,000.  The Plaintiff testified that the First Receivables Agreement was executed without his knowledge or consent.  The Defendant testified that the money from the First Receivables Agreement was deposited in the MD Request bank account on January 30, 2017.  In the weeks that followed, the Defendant caused MD Request to write five checks to himself personally, totaling $40,000: (1) check #370 on January 30, 2017, for $20,000; (2) check #379 on February 8, 2017, for $5,000; (3) check #380 on February 17, 2017, for $5,000; (4) check #382 on February 23, 2017, for $5,000; and (5) check #384 on February 28, 2017, for $5,000.[13]

In July 2017, the Defendant made loan payments to Jet Capital.  In the expense reports he provided to MD Request's outside accountant, the Defendant reported office loan payments

---

[12] Ex. 19.

[13] Ex. 16.

totaling $7,225.68.[14]  However, in the expense reports the Defendant provided to the Plaintiff, this office loan line item was not present.[15]  Instead, a comparison of the expense report the Defendant provided to the outside accountant[16] and the expense report the Defendant provided to the Plaintiff[17] shows that the Defendant inflated various unrelated expenses by adding $1,000 to the Transfirst expense, $625 to the Healthfusion expense, $2,000 to the Labcorp expense, $2,000 to the Fed Tax expense, and a $1,600.68 finance fee.  The sum of these additions equals the same $7,225.68 loan payment reported to the outside accountants.

On October 17, 2017, the Defendant, on behalf of MD Request, signed another agreement with Jet Capital, under which MD Request sold $43,544.35 of future receipts for $30,000.[18]  The Plaintiff testified credibly that he had no knowledge of the Second Receivables Agreement.

On November 7, 2017, the Defendant, on behalf of MD Request, signed a third agreement with Jet Capital, under which MD Request sold $13,967.04 of future receipts for $10,000.[19]  Again, the Plaintiff testified credibly that he had no knowledge of the Third Receivables Agreement.

Despite the Defendant's somewhat unusual behavior surrounding the Receivables Agreements and the Plaintiff not knowing about them, the fact remains that the proceeds from the Receivables Agreements were deposited directly into the joint account of MD Request.  It appears that some of the proceeds from the Receivables Agreements were transferred to the Defendant shortly after MD Request received them, but it is not clear that the Defendant was not owed these

---

[14] Ex. 30.

[15] Ex. 29.

[16] Ex. 30.

[17] Ex. 29.

[18] Ex. 20 (*Agreement for the Purchase and Sale of Future Receipts*) (the "Second Receivables Agreement").

[19] Ex. 21 (*Agreement for the Purchase and Sale of Future Receipts*) (the "Third Receivables Agreement," and together with the First Receivables Agreement and Second Receivables Agreement, the "Receivables Agreements").

amounts by MD Request at the time. It is also true that the Defendant often caused MD Request to make payments to the Plaintiff at times when MD Request did not have enough remaining funds to pay the Defendant.

While the Plaintiff proved the existence of these transactions, there was not sufficient evidence presented for the Court to determine that the Plaintiff or MD Request were harmed by them. This is partially because there was not sufficient evidence at trial as to how the funds obtained through the Receivables Agreements were used or, more specifically, that they were used for anything other than proper business expenses of MD Request.

### 2. MedSpa-Related Expenses

In mid-2016, MD Request opened a second clinic. The Plaintiff operated the new facility in Frisco, Texas while the Defendant maintained operations in the Dallas location. The Defendant testified that at this time, he expanded his operations and began to offer minor aesthetic procedures, such as body contouring and laser tattoo removal. These expanded operations were generally referred to as "MedSpa." Revenue generated by MedSpa was deposited in the MD Request account through the Square payment system, from which MD Request also paid expenses of MedSpa. During trial, the Plaintiff took issue with expenses of MedSpa related to an equipment lease, an equipment financing agreement, several business loans, and employee wages.

To advance MedSpa operations, MD Request signed an equipment lease agreement for a tattoo removal laser system, which required MD Request to make monthly lease payments. Importantly, the signatures of both the Plaintiff and the Defendant are on the equipment lease agreement, but the Plaintiff claims his signature was forged.[20]

---

[20] Apart from this action, the Plaintiff filed a forgery complaint with the Dallas Police Department on August 24, 2019, alleging that the Defendant executed the lease agreement without his knowledge or consent and forged the Plaintiff's signature. *See* Ex. 27.

In addition to the equipment lease agreement, the Defendant also executed an equipment financing agreement and several business loans:

- On August 31, 2017, the Defendant, on behalf of MD Request, executed an equipment financing agreement with Ascentium Capital related to a contouring laser.[21] The financing agreement obligated MD Request to make 60 monthly payments of $2,195.23.

- On August 3, 2018, the Defendant, on behalf of MD Request, obtained a $30,000 loan from Ascentium Capital through a Business Loan and Security Agreement ("First Ascentium Business Loan").[22] The First Ascentium Business Loan obligated MD Request to make daily payments in the amount of $193.65 for a term of 189 business days.

- On October 22, 2018, the Defendant, on behalf of MD Request, obtained a $60,000 loan from Ascentium Capital through another Business Loan and Security Agreement ("Second Ascentium Business Loan").[23] The Second Ascentium Business Loan obligated MD Request to make daily payments in the amount of $393.65 for a term of 189 business days.

- On January 25, 2019, the Defendant, on behalf of MD Request, obtained a $60,000 loan from Ascentium Capital through another Business Loan and Security Agreement ("Third Ascentium Business Loan").[24] The Third Ascentium Business Loan obligated MD Request to make daily payments in the amount of $295.24 for a term of 252 business days.

The Plaintiff once again proved that these transactions took place but did not present sufficient evidence for the Court to determine that the Plaintiff was harmed by them. The relevant equipment appears to have been obtained and used for the benefit of MedSpa, but the revenue from MedSpa was deposited directly into MD Request's bank account. Based on their formula for calculating distributions from MD Request, under which each doctor would receive his collections reduced by one half of the shared expenses, one would have expected that any increase in the

---

[21] Ex. 23, Agreement No. 2251192.

[22] Ex. 23, Agreement No. 2305967.

[23] Ex. 23, Agreement No. 2320947.

[24] Ex. 23, Agreement No. 2346503.

shared expenses of MedSpa, which would have bolstered the Defendant's collections but not the Plaintiff's, would have harmed the Plaintiff, but the evidence did not bear this out. Rather, the Plaintiff seems to have benefitted, at least somewhat, from the MedSpa revenues, and it is therefore not possible for the Court to find that the Plaintiff was harmed by the MedSpa expenses, or if he was harmed, in what amount.

The funds from the business loans were deposited in the MD Request bank account as well, and the Plaintiff did not produce sufficient evidence as to how these funds were used or, more specifically, that they were used for anything other than proper business expenses of MD Request. The proceeds from the loans, as well as the revenues from MedSpa, were commingled in the MD Request bank account with the other MD Request collections.

The Plaintiff also complained about the wages paid to Samantha Brumfield, an employee of MedSpa. From December 2017 through January 2019, MD Request paid Ms. Brumfield $55,587.41 in wages for her employment. While she worked at MedSpa, her wages, like other MedSpa expenses, were paid by MD Request. The Plaintiff proved that these wages were paid but did not present sufficient evidence for the Court to determine that they were not a proper business expense for MD Request, and as with the other MedSpa expenses, did not present sufficient evidence for the Court to determine that they harmed the Plaintiff.

### 3. Insurance Payments

From 2016 through March 2019, the Defendant paid his personal health insurance premiums through MD Request and included them in the monthly overhead expenses.[25] The evidence and testimony illustrate that during this period, MD Request paid $76,792.53 solely for

---

[25] Ex. 24.

the Defendant's health insurance.  The evidence did not show that this was not a proper expense for MD Request.

The Defendant also, however, caused MD Request to pay the health insurance premiums for a non-employee relative of the Defendant beginning in 2018 and terminating in March 2019.[26] MD Request paid $20,037.07 for the health insurance premiums of the Defendant's relative.  The Defendant's testimony as to his understanding regarding the payment of health insurance was unreasonable.  The Defendant clearly knew that he could not pay the health insurance premiums of his family member.

### 4.  Unpaid Rent

When calculating the Plaintiff's distributions from MD Request, the Defendant deducted amounts for rent that was not actually paid.[27]  Specifically, MD Request failed to make any rent payments for the Frisco location from February 1, 2019, through May 1, 2019.  As of May 2019, the rental payments for the Dallas location remained unpaid in the amount of $29,038.76, and rental payments for the Frisco location were in arrears in the amount of $9,295.65.  Nevertheless, the Defendant included deductions for monthly rental expenses when calculating the Plaintiff's distributions from MD Request for the entire period in question.[28]  In total, the Defendant charged MD Request $42,305.02 in excess of what he actually paid.

### 5.  Other Expenses

The Defendant purchased a suit at Men's Wearhouse for $1,217.78 in August 2018.[29]  The Defendant testified that this suit was purchased for use at various speaking engagements and for

---

[26] *Id.*

[27] Exs. 26, 29, and 31.

[28] Exs. 29 and 31.

[29] Ex. 6.

professional networking purposes. The evidence did not show that this was not a proper expense for MD Request.

On October 13, 2017, the Defendant paid $1,538.25 in child support using MD Request's bank account.[30] Further, the Defendant accumulated MD Request expenses in the amount of $9,484.78 for personal loans obtained from Kabbage, LLC.[31] The Defendant testified these were personal loans he used to pay personal credit cards. Lastly, in July 2018, and for the first time since its formation, MD Request paid a $6,000 management fee to the Defendant.[32] The child support, personal loans, and management fee were not proper business expenses of MD Request.

**D. Discovery of Expense Issues and Filing of State Court Lawsuit**

The Plaintiff testified that after receiving the MD Request tax returns for 2018, he found an inconsistency between the itemized expenses of MD Request and the amounts in the expense reports the Defendant had produced to the Plaintiff. Less than thirty days later, on April 29, 2019, the Plaintiff filed a lawsuit against the Defendant in the 116th Judicial Court of Dallas County, Texas (the "State Court Lawsuit"). In the State Court Lawsuit, the Plaintiff claims that the Defendant is liable to him for any underpayment of his compensation due to unnecessary or improper expenses deducted from the Plaintiff's agreed-upon compensation. The complaint in the State Court Lawsuit alleges that an analysis of the expense reports reveals the Defendant charged MD Request for expenses that were (1) not paid; (2) duplicated; (3) disguised expenses, such as bolstering various expenses to hide one lump-sum personal loan; and (4) unauthorized expenses such as health insurance for the Defendant and the Defendant's family member, payments on a

---

[30] Ex. 5.

[31] Ex. 31.

[32] Exs. 6 and 31.

hidden loan, and payments that benefitted his affiliates and his homestead. The State Court Lawsuit was later referred to arbitration with the American Arbitration Association and was pending as of September 18, 2019, the date the Defendant filed his chapter 7 bankruptcy case.

## E. Witness Credibility Determinations

Overall, the Court finds that the Plaintiff was credible. However, he did not provide sufficient evidence for a number of his claims.

The testimony of the Defendant was not entirely reliable. It appears the Defendant was not altogether forthcoming with the Plaintiff and took advantage of his control over MD Request's financial operations at times. His testimony regarding payment of the relative's insurance, the management fee, and the rent charged but not paid rent was not credible.

## IV.    CONCLUSIONS OF LAW

The Plaintiff alleges that the Defendant committed fraud and breached his fiduciary duties, and that the Plaintiff should be awarded damages and attorneys' fees as his claim against the Defendant. The Plaintiff also argues that under sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code, his claim against the Defendant should be deemed nondischargeable. The Defendant denies that he owes any debt to the Plaintiff, denies that the debt (if any) should be held nondischargeable, and asserts numerous affirmative defenses.

Because there is no pre-existing judgment on the Plaintiff's claims, the Court must first determine whether the Plaintiff has a valid underlying claim against the Defendant and, if so, what that claim is, before determining whether the claim is dischargeable.[33]

---

[33] *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479 (5th Cir. 2009) (finding that bankruptcy courts have jurisdiction to determine the amount of a debt arising under state law causes of action, and noting that "[l]ogically, the litigation necessary to prove nondischargeability also proves the basis for and amount of the debt").

## A. The Plaintiff's Underlying Claims

As noted, the Plaintiff has generally asserted claims against the Defendant for fraud and breach of fiduciary duty, and the Defendant has raised several affirmative defenses to those claims. The Court will begin with the elements of the claims and whether they are satisfied.

### 1. Fraud

To prevail on a fraud claim under Texas law, a plaintiff must show (1) the defendant made a material representation, (2) the representation was false, (3) when the representation was made, the defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intent that the plaintiff should act upon it, (5) the plaintiff acted in reliance on the representation, and (6) the plaintiff suffered injury as a result.[34] The fifth element really contains two requirements: the plaintiff must show that he actually relied on the defendant's representation and, also, that such reliance was justifiable.[35]

The Plaintiff primarily contends that the Defendant defrauded him by improperly charging MD Request for expenses that resulted in the Plaintiff receiving smaller distributions from MD Request than he otherwise would have. In terms of what representations the Defendant made to the Plaintiff, the Plaintiff primarily points to the expense reports produced by the Defendant. The Court agrees that through the expenses charged to MD Request, the expense reports produced by the Defendant, and the calculation of the amounts payable to the Plaintiff from MD Request, the Defendant made ongoing representations to the Plaintiff that amounts charged to MD Request as

---

[34] *Allstate Ins. Co. v. Receivable Fin. Co. LLC*, 501 F.3d 398, 406 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

[35] *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)).

expenses were proper expenses of MD Request that were actually incurred and paid. The evidence shows that these representations were material and, in many instances, false.

Some representations made by the Defendant were false because the expenses were not proper, such as in the case of payments for (1) health insurance premiums for a non-employee relative of the Plaintiff's, (2) child support, (3) the Defendant's personal loan from Kabbage, LLC, and (4) the Defendant's management fee. Other representations were false because the Defendant had not actually paid the expenses for which MD Request was being charged, as in the case of rental payments.

Based on the evidence presented at trial, the Court finds and concludes that the Defendant knew these representations were false when they were made. In one instance, the Defendant was caught in a deliberate attempt to conceal an expense by presenting the Plaintiff with an expense report that had been altered from the version produced to MD Request's outside accountants to remove one expense and inflate others. For most of the improper expenses though, the Court does not find it credible that the Defendant would have believed they were valid and appropriate.

The Court further finds and concludes that the Defendant intended that the Plaintiff would act in reliance on these representations by accepting the amount of the distributions and continuing to perform services and generate receivables for MD Request, which the Plaintiff did. The Plaintiff's reliance was justified and reasonable. The two parties were business partners and friends, but even with that, throughout their business relationship, the Plaintiff would occasionally inquire about expenses. It is true that the Plaintiff had access MD Request's accounting records, but there does not appear to have been sufficient cause for him to undertake his own audit of the records prior to seeing MD Request's 2018 tax return.

The Plaintiff has suffered injury as a result of his reliance on the Defendant's false representations. Each time the Defendant charged an improper expense to MD Request, half of that expense was deducted from the Plaintiff's distributions. Specifically, the Plaintiff suffered injury in the amount of $39,682.55, consisting of the following amounts:

- $10,018.53 due to the improper expense deductions resulting from the payment of health insurance premiums for a non-employee relative of the Defendant. This amount represents half of the $20,037.07 paid by MD Request in 2018 and 2019.

- $769.12 due to the improper expense deductions resulting from the payment of child support by MD Request. This amount represents half of the $1,538.25 paid by MD Request in 2017.

- $4,742.39 due to the improper expense deductions resulting from the payment of the Kabbage, LLC personal loan by MD Request. This amount represents half of the $9,484.78 paid by MD Request in 2019.

- $21,152.51 due to the improper expense deductions resulting from the non-payment of rent by the Defendant. This amount represents half of the $42,305.02 charged to MD Request but never subsequently paid by the Defendant in 2018 and 2019.

- $3,000 due to the improper expense deductions resulting from MD Request's payment of $6,000 to the Defendant for a management fee in 2018.

For the reasons discussed previously, expenses related to the Receivables Agreements, MedSpa, the Defendant's personal health insurance premiums, and a suit purchased by the Defendant, were not included in the damages because there was not a sufficient showing that such expenses were improper and harmed the Plaintiff.

## 2. Breach of Fiduciary Duty

In addition to the claim for fraud, the Plaintiff also asserted a claim against the Defendant for breach of fiduciary duty. Under Texas law, to prevail on a breach of fiduciary duty claim, a plaintiff must show (1) a fiduciary relationship between the plaintiff and the defendant, (2) that the

defendant breached his fiduciary duty to the plaintiff, and (3) that the defendant's breach resulted in injury to the plaintiff or benefit to the defendant.[36]

It is not clear whether there was a fiduciary relationship directly between the Plaintiff and the Defendant. Courts generally hold that a managing member of a limited liability company does not necessarily owe fiduciary duties to other members.[37] Although "the Texas statute governing limited liability companies implies that certain duties may be owed, it does not define any such duties, but rather allows the contracting parties to specify the breadth of those duties in the company agreement."[38]

Per the Company Agreement, both the Plaintiff and the Defendant served as Manager-Members. Article VIII of the Company Agreement provides various rights, duties, and powers of the Managers. Per this section, the Managers "shall have the full, sole, exclusive and complete discretion in the management and control of the business, operations and affairs of the Company; shall make all decisions that are necessary to carry out the business of the Company . . . ."[39] The same section goes on to require that "[a]ll decisions and actions by the Managers shall be made in the best interests of the Company." Thus, the Company Agreement makes it clear that the

---

[36] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied).

[37] *See Campbell v. Texas Tea Reclamation, LLC*, No. 3:20-CV-00090, 2021 U.S. Dist. LEXIS 103453 (S.D. Tex. May 6, 2021) ("For what it's worth, Texas appears to have charted a different path in this area of the law, with most states imposing fiduciary duties on members of an LLC under both statutes and common law."); *ETRG Invs., LLC v. Hardee (In re Hardee)*, No. 11-6011, 2013 Bankr. LEXIS 949, at *29 (Bankr. E.D. Tex. Mar. 14, 2013) ("It is widely recognized that there is no formal fiduciary relationship created as a matter of Texas law between members of a limited liability company.") (quotation omitted); *but see Cardwell v. Gurley*, No. 4-10-CV-706, 2011 U.S. Dist. LEXIS 145358, at *5-6, 24-26 (E.D. Tex. Dec. 19, 2011) (noting, in the context of a nondischargeability action in bankruptcy, the legal conclusion of a state court that the debtor, as the managing member of a two-person limited liability company, owed fiduciary duties directly to the other member of the limited liability company as a matter of law).

[38] *Pacific Addax Co. v. Lau (In re Lau)*, No. 11-4203, 2013 Bankr. LEXIS 4587, at *74-75 (Bankr. E.D. Tex. Nov. 4, 2013); TEX. BUS. ORGS. CODE § 101.401.

[39] Company Agreement, Sec. 8.1.

Defendant owed a fiduciary duty to MD Request[40] but does not resolve the issue of whether the members owed fiduciary duties to each other because it neither disclaims nor expressly imposes such duties.

Nevertheless, Texas law recognizes that an informal fiduciary relationship, "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one."[41] The existence of a fiduciary duty is a fact-specific inquiry that takes into account the contract governing the relationship as well as the particularities of the relationships between the parties.[42] Some courts have taken into account the "unequal" positions of power of members in a limited liability company, such as when one member exercises superior control over the company.[43]

Both parties testified during trial that the Defendant almost exclusively handled the finances for MD Request. The Defendant did the calculations and remitted payments to the Plaintiff. Through an established course of dealing for the better part of six years, the Plaintiff placed a special confidence in the Defendant to compensate the Plaintiff accurately and honestly for his revenue, which was to be measured as his monthly collections less his half of the shared expenses.

Based on these facts, the Court believes there is a reasonable argument that the Defendant owed fiduciary duties directly to the Plaintiff, but the Court need not make that determination since

---

[40] The Plaintiff has not pled a derivative cause of action for breach of fiduciary duty against the Defendant.

[41] *Navigant Consulting*, 508 F.3d at 283 (quoting *Jones v. Blume*, 196 S.W.3d 440, 449 (Tex. App.—Dallas 2006, pet. denied).

[42] *Gadin v. Societe Captrade*, No. 08-CV-3773, 2009 U.S. Dist. LEXIS 51561, at *9 (S.D. Tex. June 17, 2009).

[43] *Suntech Processing Sys., L.L.C. v. Sun Communications, Inc.*, No. 99-00213, 2000 Tex. App. LEXIS 8094, at *18-19 (Tex. App.—Dallas Dec. 5, 2000, pet. denied); *Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355, 391-93 (Tex. App.—Houston [1st. Dist.] 2012, pet. granted, judgm't vacated w.r.m.).

the Court has already determined the Plaintiff has a claim for fraud, and the damages for breach of fiduciary duty would be the same as those previously identified for fraud.

### 3. Affirmative Defenses

The Defendant has urged several affirmative defenses to the Plaintiff's claim.[44]  Of note, the Defendant argues that the statute of limitations bars a significant portion of the Plaintiff's claim, that the equitable doctrine of unclean hands should bar recovery, that the Defendant is entitled to some sort of offset for the Plaintiff's claim, that the economic loss rule precludes the Plaintiff's claim, that the Defendant has defenses available under the Texas Business Organizations Code, and that the Plaintiff lacks standing to bring the claims in the Complaint.

Several of the Defendant's affirmative defenses can be disposed of in short order.  The Defendant is likely correct that any claim on account of acts or omissions prior to April 29, 2015 would be barred by the statute of limitations, but in closing arguments, the Plaintiff confirmed that he was no longer pursuing claims based on acts or omissions that took place prior to 2016.  The Defendant's defense based on the equitable doctrine of unclean hands fails for a lack of evidence.  The Defendant's request for offset, recoupment, or credit for the Defendant's claim against the Plaintiff likewise fails for a lack of evidence.  The economic loss rule, which generally prevents recovery in tort for economic losses if the plaintiff's only damages were caused by the defendant's failure to perform under a contract, is not applicable in every situation, and claims for breach of fiduciary duty and fraud are among the exceptions that have been recognized.[45]

---

[44] The Defendant raised these defenses in his Answer and incorporated them by reference in the Joint Pretrial Order. Several of the Defendant's arguments are addressed through the Court's findings regarding the elements of the various claims and are omitted from this discussion.

[45] *Haynes v. Hawkes*, No. 05-17-00304, 2018 Tex. App. LEXIS 4758, at *10 (Tex. App.—Dallas June 27, 2018, no pet.).

In his Answer, which was incorporated by reference in the Joint Pretrial Order, the Defendant claims "all defenses available to Defendant under the Texas Business Organizations Code, including, without limitation, all defenses and provisions of Sections 21.223, 101.002 and 101.114 of that Code."[46] These cited provisions do not help the Defendant because (1) the Defendant is not being held liable for a debt, obligation, or liability of a limited liability company, and (2) these provisions do not protect the Defendant from liability for perpetrating a fraud for his own benefit. The Defendant did not direct the Court to any other potential defenses under the Texas Business Organizations Code.

The Defendant's argument that the Plaintiff lacks standing to bring the claims in the Complaint is a bit more complicated. The Defendant contends that the Plaintiff's allegations against the Defendant involve wrongs and injuries committed by the Defendant only against MD Request and that the Plaintiff sustained no direct injuries or damages from the Defendant's alleged misconduct. Therefore, the Defendant contends, any claims belong to MD Request, and the Plaintiff lacks standing to assert the claims or to object to their discharge in this lawsuit. The Court disagrees.

While section 101.463 of the Texas Business Organizations Code allows courts to treat a derivative proceeding brought by a member of a closely held limited liability company as a direct action brought by the member for the member's own benefit if justice so requires—and the Court would find that justice so requires in this case—it is not necessary to do so because the claim in this case is a direct claim.

The injury suffered by the Plaintiff was particular to him and not suffered by the other members, there being only one other member, who benefited from these transactions rather than

---

[46] Joint Pretrial Order at 3.

suffered. In addition, the injury did not merely result in the depreciation of the value of the Plaintiff's interest in MD Request. Rather, the Defendant's actions directly affected the Plaintiff's regular distributions by altering their calculation, and the Plaintiff was the only one harmed.

Most importantly, the Court has analyzed the Plaintiff's claim as a direct claim for fraud and found that the Plaintiff, in his individual capacity, has satisfied the required elements.[47] That is, the Defendant knowingly made material false representations to the Plaintiff with the intent that the Plaintiff would act on those representations, the Plaintiff did act in reasonable reliance on those representations, and the Plaintiff suffered an injury as a result. The Plaintiff has standing to bring this claim.

Because the elements of a claim for fraud have been satisfied and the Defendant does not have any valid defenses to that claim, the Court finds that the Plaintiff holds a valid claim against the Defendant for fraud in the amount of $39,682.55. The Court will now turn to the issue of dischargeability.

## B. Dischargeability of the Plaintiff's Claims

In an action to determine the dischargeability of a debt, the party promoting the exception to discharge must prove by a preponderance of the evidence that the debt is nondischargeable.[48] Exceptions to discharge must be strictly construed against the creditor and liberally construed in favor of the debtor.[49]

---

[47] *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (stating that the general rule that a shareholder cannot properly recover damages for injury to a corporation "does not, of course, prohibit a stockholder from recovering damages for wrongs done to him individually 'where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder'").

[48] *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

[49] *Id.* (citing *Hudson v. Raggio (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)).

### 1.  Dischargeability Under Section 523(a)(2)(A)

To obtain relief under section 523(a)(2)(A), the Plaintiff must show that the Defendant owes the Plaintiff a debt "for money, property, services, or an extension, renewal, or refinancing of credit" that was "obtained by false pretenses, a false representation, or actual fraud."  The Fifth Circuit has distinguished the elements of "false pretenses and false representations" from "actual fraud."  False representations and false pretenses within the meaning of section 523(a)(2)(A) require that the creditor prove (1) the existence of a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the creditor.[50]

To support a cause of action for actual fraud under section 523(a)(2)(A) a creditor must prove that (1) the debtor made a representation; (2) the debtor knew that the representation was false at the time it was made; (3) the debtor made the representation with the intent and purpose to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as the proximate result of its reliance on the representation.[51]

Based on the Court's prior findings regarding the Defendant's liability for fraud, the Court finds that the elements for both "false pretenses and false representations" and for "actual fraud" have been satisfied and the Plaintiff's claim for fraud is nondischargeable under section 523(a)(2)(A).

### 2.  Dischargeability Under Section 523(a)(4)

To obtain relief under section 523(a)(4) the Plaintiff must show that the Defendant owes the Plaintiff a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  The Fifth Circuit has stated that "this discharge exception was intended to reach those

---

[50] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995).

[51] *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's."[52] In addition, defalcation, for the purposes of section 523(a)(4), "includes a culpable state of mind requirement" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."[53] Thus, it is a "lesser standard than fraud and . . . does not require actual intent, as does fraud," and is "essentially a recklessness standard."[54]

Based on the Court's prior findings regarding the Defendant's fraudulent conduct, if the Court were to have found that the Defendant owed a fiduciary duty to the Plaintiff, the Plaintiff would hold a breach of fiduciary duty claim that would be nondischargeabile under section 523(a)(4) as a claim for fraud or defalcation while acting in a fiduciary capacity. Because the Court did not reach the issue of whether the Defendant owed a fiduciary duty directly to the Plaintiff, the Court similarly does not reach the issue of whether relief is appropriate under section 523(a)(4).

## C. Attorneys' Fees

In the Fifth Circuit, a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.[55] The Plaintiff's claim for attorneys' fees was not included in the Joint Pretrial Order and has therefore been abandoned. Even if the

---

[52] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

[53] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013).

[54] *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997).

[55] *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000).

request were not abandoned, the Court would not be inclined to grant attorneys' fees in this case unless an award of attorneys' fees was mandatory.

## D.  Conclusion

For the reasons discussed herein, the Court will award the Plaintiff a claim against the Defendant in the amount of $39,682.55 for fraud and has determined that such claim constitutes a nondischargeable debt under section 523(a)(2)(A) of the Bankruptcy Code.  Judgment will be entered in favor of the Plaintiff.

##End of Findings of Fact and Conclusions of Law##